**SPARTANBURG GENERAL HOSPITAL, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 7:84-2157-3.**

United States District Court, D. South Carolina, Spartanburg Division.

April 26, 1985.

Roy McBee Smith, Spartanburg, S.C., Leonard C. Homer, Robert E. Mazer, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for plaintiff.

James D. McCoy, III, Greenville, S.C., Carl H. Harper, Regional Atty., Edgar M. Swindell, Asst. Reg. Atty., Dept. of Health & Human Services, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

This case is before the Court on the defendant's motion for judgment on the pleadings and the plaintiff's cross-motion for summary judgment. The plaintiff is a non-profit general community hospital (the "provider") which is an approved provider of hospital services under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("the Medicare program"). The defendant is the Secretary of Health and Human Services ("the Secretary"), who is responsible for the administration of the federally funded Medicare program which provides health insurance for the elderly and disabled. Under Part A of Medicare, approved hospitals receive reimbursement directly from the program for the reasonable costs of allowable items and services that they provide to such beneficiaries.

Plaintiff instituted this action to challenge a final decision of the Secretary concerning reimbursement of certain capital-related costs incurred during a construction project for a hospital addition. The costs in dispute are architectural fees relating to the development of final construction drawings which the provider "abandoned" in favor of a second set of plans designed by a different architect. The change in architects was occasioned by the failure of the construction bids for the original plans to come within the cost estimate for the project. Specifically, the provider challenges the determination by the Secretary that the fees should be capitalized as an element of the historical cost of the com-

pleted addition with reimbursement accomplished through periodic depreciation allowances over the useful life of the facility rather than immediate recognition as an expense in the cost year in which the fees were incurred.

Plaintiff challenges the Secretary's decision to capitalize these costs on the grounds that such decision is arbitrary and capricious, an abuse of discretion, inconsistent with the Medicare Act, implementing regulations and policy, an improper retroactive reversal of agency policy in violation of the due process clause of the Constitution, and unsupported by substantial evidence. In addition, plaintiff alleges that the provisions of the Provider Reimbursement Manual ("the Manual") relied upon by the Secretary in her accounting treatment of the costs involved, and her administrative interpretation thereof, are substantive, rather than interpretive, in nature, and therefore are invalid because not promulgated with notice and comment pursuant to the Administrative Procedure Act ("the APA"), 5 U.S.C. § 551 *et seq.*

The Court's jurisdiction over this challenge is premised on 42 U.S.C. § 1395oo(f)(1). The Court has carefully studied the lengthy and comprehensive memoranda submitted by both sides including plaintiff's post-hearing reply brief, the oral arguments of counsel, and the administrative record herein and finds that this case is amenable to summary disposition as a matter of law. Accordingly, for the reasons hereinafter stated, the Court will grant defendant's motion for judgment on the pleadings as to all issues raised by the plaintiff, and deny plaintiff's motion for summary judgment.

### I. *Factual and Procedural Background.*

In 1977, the provider, Spartanburg General Hospital, engaged a local architectural and engineering firm, Lockwood Greene Engineers, Inc. ("Lockwood Greene"), to formulate a proposal to construct an addition to the existing hospital facility comprised of a psychiatric unit and a 600 space parking structure, and augmented later in the planning process to include a radiation therapy department. The project was subject to a cost estimate of $6.7 million dollars, which was the maximum expenditure the provider stated it could afford.

In August 1979, the provider contracted with Lockwood Greene to provide all necessary professional services leading to the preparation of final construction drawings to be let for bid, and culminating in the supervision of the construction phase. The Lockwood Greene design called for the integration of the hospital components into the parking structure. Prior to being let for bid, the architect revised its cost estimate to $8.2 million dollars, but the lowest bid received was $10.3 million. After modifying the specifications through negotiation with the parties, the successful bidder revised its bid downward to $8.3 million. The provider elected, however, on January 27, 1981 to reject all bids and terminate the services of Lockwood Greene. Total compensation paid to the architect was $560,106.

At this time the provider was faced with having to get construction underway by June 1981 when the certificate of need for the project would expire. On February 2, 1981, the provider signed a contract with the second architect, Freeman White Associates, Inc., ("Freeman White"), for the design of a psychiatric facility, parking garage, and radiation therapy unit. The agreed compensation was $325,000 which was capitalized as part of the historical cost of the facility and is not in dispute in this action.

The Lockwood Greene plans were given to Freeman White and served as a basis for discussion of the provider's desired design concepts. Freeman White decided that to come within the provider's budget, the parking component would have to be deleted and constructed as a separate structure at a later date. Freeman White thus designed a two-story addition for the psychiatric and radiation therapy departments, and a low bid of $5.6 million dollars was received on June 9, 1981. Additional parking for 1,055 spaces was later constructed

as a separate project for $2.7 million dollars.

When the provider filed its annual cost report seeking Medicare reimbursement for the year ending September 26, 1981, it claimed as a current year expense the entire $560,106 paid to Lockwood Greene. The provider had considered these costs to be for architectural plans that it had entirely abandoned and from which it derived no remaining discernible benefit such that the costs could be expensed under generally accepted accounting principles.

The fiscal intermediary, Blue Cross and Blue Shield of South Carolina, acting pursuant to contract with the Secretary, was required to audit the cost report submitted by the provider and adjust the amount of reimbursement claimed, if necessary, to ensure compliance with the Medicare manuals and regulations. 42 U.S.C. § 1395h. The intermediary determined in this case that the provider had not abandoned its plans to construct a psychiatric-radiation therapy addition, and consequently all preliminary planning costs attributable thereto should be capitalized as part of the historical cost of the completed addition to the facility, pursuant to Provider Reimbursement Manual (HIM–15), Part I, § 2154.4(A).[1] The intermediary agreed, on the other hand, that the provider had abandoned its then present intention to build a parking structure.

These determinations were reflected in the Notice of Program Reimbursement issued by the intermediary on August 12, 1982 which allowed as a current year expense $70,000 in fees attributed to the parking garage and disallowed the remaining $490,106. The adjustment reduced Medicare reimbursement for that period by $185,932.

Pursuant to 42 U.S.C. § 1395oo(a), the provider requested a hearing before the Provider Reimbursement Review Board ("PRRB" or "the Board"). In a written decision issued May 14, 1984, the Board reversed the determination of the fiscal intermediary, finding that the second architect did not use the original plans in rendering his design for the structure.[2] On June 1, 1984, the Administrator of the Health Care Financing Administration sent written notification to the parties of her intent to review the Board's decision, pursuant to 42 U.S.C. § 1395oo(f). On July 11, 1984, the Deputy Administrator on behalf of the Secretary rendered the final agency decision reversing the Board and reinstating the fiscal intermediary's determination in full.[3] The Deputy Administrator concluded that discernible benefit had been established through application of the Manual provision concerning preliminary plans and by adequate proof of actual benefit. This appeal seeking a review on the record followed.

## II. *Statutory and Regulatory Background.*

The Medicare program is structured around the concept of reimbursement to the provider for the reasonable cost of providing medical services to Medicare benefi-

---

1. This provision reads in pertinent part:
 2154.4 *Planning Costs Where Plans Are Abandoned.*—
 A. *Allowable.*—If a provider abandons its plans to construct or purchase a facility, the cost of such plans is allowable if the planning was for the purpose of expanding, rebuilding, or relocating the operations of the certified facility. (See § 2155 for abandoned construction-in-progress.) Plans are deemed abandoned when there is no remaining discernible benefit to a provider. If a facility is completed, all feasibility studies and preliminary plans relating to the building project have a discernible benefit to a provider since they are used as part of the decision-making process on whether to build the facility. Thus, such plans, even if they are not directly used in the building of the facility, are not considered abandoned. The costs of such plans should be included in the historical cost of the facility when it is completed. (Effective for all cost reports open on or after June 1, 1978).

2. PRRB Hearing Decision No. 84–D120 *reported in* Medicare and Medicaid Guide (CCH), New Developments Binder ¶ 34,074.

3. HCFA Administrator's Decision *reported in* Medicare and Medicaid Guide (CCH), New Developments Binder ¶ 34,075.

ciaries.[4] 42 U.S.C. § 1395x(v)(1)(A). The Secretary is authorized to establish, by regulation, methods by which to determine reasonable cost and the items to be included in such a determination. *Id.* The Secretary has defined reasonable costs to include "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. § 405.451(b). Capital-related costs associated with the acquisition and dedication of the necessary plant, equipment, supplies, and materials used in providing care to eligible beneficiaries are allowed to the extent of depreciation as provided in 42 C.F.R. § 405.415. The regulation requires such depreciation to be identifiable, recorded, based on the historical costs of the asset, and prorated over its useful life. 42 C.F.R. § 405.415(a).

"Historical cost" is defined as the "cost incurred by the present owner in acquiring the asset." 42 C.F.R. § 405.415(b)(1). The Secretary has interpreted the plant acquisition costs to include not only the cost of brick and mortar items, but also other direct and indirect capital costs related to the rendering of care to Medicare patients.[5]

The treatment of architectural fees and other planning costs is discussed in sections 2154.1 *et seq.* of the Manual. Specifically, reasonable and prudent costs attributed to planning activities are recognized under Medicare as part of the historical cost of a completed facility, provided the construction or acquisition project has satisfied the requirements of state certificate of need laws and section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1. PRM, Part I, § 2154.3. The treatment of "abandoned" planning costs is addressed in Manual section 2154.4, the interpretation of which is at issue in this case.

### III. *Scope and Standard of Review.*

 Judicial review of a decision of the Deputy Administrator is limited to determining whether the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence on the record taken as a whole.[6] 5 U.S.C.

---

4. The cost reimbursement system was in effect during the period at issue in this litigation. By statute effective October 1, 1983, Congress provided for phase-in of a new prospective payment system. 42 U.S.C. § 1395ww *et seq.;* Social Security Act § 1886(d), as amended by the Social Security Act Amendments of 1983, Pub.L. 98–21. For cost reporting periods beginning on or after October 1, 1983, hospitals are paid a prospectively determined rate for Part A inpatient operating costs on a per discharge basis determined according to specific diagnostically related groups. *See* 42 C.F.R. § 405.470 *et seq.* Capital-related costs, such as those involved in this action, were excluded from the prospective payment system, and these items continue to be reimbursed on the basis of reasonable costs through at least October 1, 1986. 42 U.S.C. § 1395ww(a)(4), 42 C.F.R. § 405.454(m). Congress ordered the Secretary to conduct a study and report on proposals for including capital-related costs in the prospective payment system after that date. Section 603(a) of Pub.L. 98–21. The provider contends, that as a result of the possible changes, if it is not allowed to expense the fees, it would no longer receive reimbursement for its actual capital costs through periodic depreciation allowances. The request for a study, however, does not presage any conclusions by the Secretary or Congressional response to such a report. The future treatment of capital-related costs and the manner in which Congress may address depreciation allowances existing at the time of any change are matters of speculation. The Court is unpersuaded that this is a basis for expensing costs incurred well before enactment of the prospective payment system.

5. Examples of costs related to the construction of a new plant which Medicare recognizes as properly capitalizable include: planning costs (PRM, Part I, § 2154.1 *et seq.*); legal fees and architect fees (PRM, Part I, § 104.10); interest costs on construction loans during construction period (PRM, Part I § 206); advertising costs in connection with obtaining bids for construction or renovation projects (PRM, Part I, § 2136.1); and start-up costs (PRM, Part I, § 2132).

6. Technically, the review is not a determination of whether there is any genuine issue as to any material fact as in a ruling on a summary judgment motion, but rather whether the agency action satisfies the enumerated standards in the Administrative Procedure Act. *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979). The respective motions in this case will be referred to as denominated by the parties, but will be treated as motions to affirm or set aside the agency action in accordance with the APA.

§ 706(2)(A), (E); 42 U.S.C. § 1395oo(f)(1). In the course of its review, the Court must recognize that because of the expertise and policy-making responsibilities of the agency, administrative decisions should be given deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* — U.S. ——, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Lexington County Hospital v. Schweiker,* 740 F.2d 287, 289 (4th Cir.1984).

■ Moreover, the deferential standard in this case is not lessened because the decision of the PRRB differed from that of the Secretary. *St. Francis Hospital Center v. Heckler,* 714 F.2d 872, 874 (7th Cir. 1983), *cert. denied* — U.S. ——, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201, 1205 (5th Cir.1980), *cert. denied* 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981). The decision under review is the final agency determination, not that of subordinate hearing officers. *American Medical International v. Secretary of Health, Education, and Welfare,* 466 F.Supp. 605, 611 (D.D.C.1979), *aff'd* 677 F.2d 118 (D.C. Cir. 1981).

## IV. *Discussion.*

### 1. *Accordance With Law.*

■ The Court will first address the provider's allegation that the administrative decision violates applicable laws, regulations, and policy. Specifically, the provider contends that the decision is contrary to Medicare regulations requiring that providers be reimbursed on an accrual accounting basis; contrary to regulations allegedly requiring adherence to generally accepted accounting principles ("GAAP"); and contrary to the "plain-meaning" of Manual section 2154.4(A).

Accrual accounting procedures contemplate the expensing of costs associated with items that provide no discernible fu-

ture benefit. Statement No. 4, Accounting Principles Board, AICPA Professional Standards, AC § 1026 *et seq.* The procedures also provide that if there is a discernible future benefit, the costs are capitalized and matched incrementally with future revenue or otherwise deferred to future accounting periods. *Id.* at § 1026.19. Accrual accounting principles clearly recognize both expensing and capitalization depending upon the resolution of the discernible benefit question. Therefore the Secretary's decision would be contrary to these principles only if the Secretary capitalized the costs where there was no discernible benefit. In light of the Court's conclusion that the Secretary properly found remaining discernible benefit, hereinafter discussed, the provider's arguments are without merit.

Furthermore, the Court finds that while the Secretary is directed to consider standardized definitions and reporting practices widely accepted in the hospital industry, 42 U.S.C. § 1395x(v)(1)(A), 42 C.F.R. § 405.-406(a), she is not required to adopt them.[7] Consequently, the Secretary permissibly amended Manual section 2154.4(A) in June 1978 to add a provision which deems benefit within the basic GAAP concept for "all feasibility studies and preliminary plans" in a single, continuous project which is ultimately completed.

The Court finds the deeming provision to be a reasonable presumption grounded upon a common sense observation. Mistakes, false starts, and discarded plans are to be expected in the execution of any construction project, i.e., not all facets of any construction project are executed with what hindsight would show to be optimal efficiency, and yet the costs are considered part of the completed project. Moreover, such mistakes often provide valuable information. But even if this were not the case, the presumption relieves the Secretary and her agents from having to gauge the relative benefits derived from specific architec-

---

**7.** The record indicates that the provider's accounting expert, who was also a member of the Board of the hospital, conceded that Medicare policy may differ from GAAP and takes precedence. (Certified Administrative Record at 238, 253).

tural and engineering endeavors and from such difficult, technical tasks as the tracing of design elements and determining whether a common feature in two sets of plans is the result of borrowing or would have appeared in the particular type of building anyway.

The provider takes issue with the Secretary's application of the Manual provision, however, claiming that the Lockwood Greene plans were final plans, not preliminary plans, and had no effect on the hospital's decision whether to build the facility, and therefore the presumption was not applicable by its express terms. While the provider's argument is not wholly unreasonable, the Secretary's conclusion that the costs of the original final plans can be treated as preliminary planning costs in the context of later events leading to the ultimate completion of the project is equally reasonable. The Lockwood Greene plans were preliminary in time to the Freeman White plans. The Court finds that the Secretary's interpretation is "within the range of reasonable meanings that the words of the [provision] admit." *Lexington*, 740 F.2d at 290, *citing Psychiatric Institute of Washington, D.C. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981). Under the applicable standards of deference, where two interpretations appear reasonable, it follows that the Secretary's should control. *Lexington*, 740 F.2d at 290; *Fairfax Nursing Center, Inc. v. Califano*, 590 F.2d 1297, 1301 (4th Cir.1979).

The provider asserts that any deference on this issue is precluded because the Secretary allegedly construed the Manual provision differently in a 1980 appeal involving Takoma Adventist Hospital, Greenville, Tennessee.[8] That case also dealt with a change in architects and the treatment of "abandoned" plans, but notably it involved a change in projects. The Board stated that the first plans were *"final* plans, not simply studies and preliminary plans, relating to the *refurbishing* and *expansion*

project, not to the building project." Medicare & Medicaid Guide (CCH) ¶ 30,831 at 9555-6. (Emphasis in original). The Court is satisfied that the aside distinguishing between preliminary and final plans was dicta and that the result was predicated on the existence of two separate projects. The hospital abandoned plans to refurbish and expand its existing building in favor of constructing an entirely new building. Since the first project was never completed, the Manual provision deeming benefit would not have applied by its express terms, and the Board's reference to it was unnecessary in view of its factual finding of distinct projects. The *Takoma* decision was allowed to stand without opinion by the Administrator, and the Court finds that fact may be read as a concurrence with the result, rather than agreement with every phrase in the decision.

Finally, the provider's argument about the phrase, "used as part of the decision-making process on *whether* to build the facility," can be summarily dismissed. The phrase does not state a condition for application of the Manual section, but instead states one reason for the presumption. Furthermore, the Lockwood Greene plans and activities were part of the process of determining *whether* to continue to build the project as planned or to delete portions.

### 2. *Arbitrary and Capricious Test.*

■ The provider contends that the Secretary's decision is arbitrary, capricious, and an abuse of discretion based on an allegation that similarly situated providers have been treated differently. The only reported cases addressing the issue of "abandoned" architectural plans are PRRB Hearing Decision No. 77–D43, Medicare and Medicaid Guide (CCH) [1977 Transfer Binder] ¶ 28,523, *aff'd* HCFA Administrator Decision, ¶ 28,602, the *Takoma* case referred to previously, and the case at bar.

Board Decision No. 77–D43 presented facts nearly identical to the case at bar, but

---

8. PRRB Hearing Dec. No. 80–D102, December 18, 1980 (cost reporting period ending June 30, 1977) (Takoma Adventist Hospital, Greenville

Tennessee), reported in Medicare & Medicaid Guide (CCH), New Developments Binder ¶ 30,-831.

it involved a cost year prior to the addition of the deeming of benefit provision to the Manual by Transmittal No. 203, (June 1978), effective for all cost reports open on or after June 1, 1978. Furthermore, there was no indication in that case that the original plans were ever given to the subsequent architect or formed a basis of discussion of the provider's design concepts as in the case at bar. The *Takoma* case is clearly distinguishable on the basis of the presence of two different projects.

During the pendency of its appeal before the Board, the provider learned of informal, unpublished advice rendered by a Medicare official to an intermediary concerning treatment of architectural fees in the case of St. Joseph's Hospital, Philadelphia, Pennsylvania. This advice has been referred to by the parties as the "Patashnik letter." [9] The facts outlined in the intermediary's letter seeking advice appear to be similar to the present case, but the official reached an opposite conclusion. The Court is satisfied, however, that the letter did not enunciate Departmental policy and appears to be an error in application of policy to specific facts. The Court notes that the intermediary's letter indicates that the St. Joseph's case was similar to one in which the PRRB had recently ruled in favor of a provider. The *Takoma* decision was issued December 18, 1980, only three weeks prior to the intermediary's reference in its letter of January 7, 1981. It is possible that the official's advice was affected by the assertion of similarity to the *Takoma* case. One mistake in a case upon which this provider never relied or had any prior knowledge does not compel the agency to perpetuate the error. *See Sirbo Holdings, Inc. v. Commissioner of Internal Revenue Service*, 509 F.2d 1220, 1222 (2d Cir.1975) ("While even-handed treatment should be the Commissioner's goal, ... perfection in the administration of such vast responsibilities cannot be expect-

ed.... The making of an error in one case, if error it was, gives other taxpayers no right to its perpetuation.").

Furthermore, the St. Joseph's case did not receive the full agency deliberation and complete factual development that occurred in the cases before the PRRB and the Administrator. Where the full resources of the agency have been brought to bear upon the issue, the Court is satisfied that the Secretary has applied the Manual provision as the specific facts dictate with sufficient consistency, such that her actions have been neither arbitrary, nor capricious, nor an abuse of discretion.

### 3. *Consistency With The Administrative Procedure Act.*

■ The Court concludes that the Manual section 2154.4(A) and the Secretary's interpretation of the provision are "interpretive" in nature so as to come within the exception to the notice and comment requirements of the APA. 5 U.S.C. § 553(b)(3)(A). *See Fairfax Nursing Center*, 590 F.2d at 1301. The Court finds that the provision interprets the regulations concerning treatment of capital-related costs and, in particular, defines the term "historical cost" by noting a constituent element of that concept. Furthermore, the Manual expressly provides that it does not have the force of regulations. While the Court is not bound by the Secretary's general characterization, the provision at issue has been properly described.

The provider argues, however, that the provision and its interpretation cannot be "interpretive" because they effect a substantial change or reversal in Medicare policy. The Court finds this assertion to be incorrect. A mere change, if that is present, is not automatically substantive; rather it must be analyzed under the appropriate test. Under this Court's test for distinguishing between substantive and in-

---

**9.** The letter, dated February 27, 1981, from Bernard J. Patashnik, Director, Division of Institutional Services Reimbursement, Bureau of Program Policy, Health Care Financing Administration, to Eugene J. Ott, Senior Director, Reim-
bursement Accounting, Blue Cross of Greater Philadelphia was obtained through the Freedom of Information Act and was not relied upon by the provider in the preparation of its cost report.

terpretive rules, enunciated in *Spring Mills, Inc. v. Consumer Product Safety Commission,* 434 F.Supp. 416, 430 (D.S.C. 1977), the Court is satisfied that the contested Manual provision and its interpretation are interpretive. They are neither complex nor pervasive; they do not effect drastic changes in existing law; they are not retroactive, nor are there practical difficulties with compliance.

The Manual provision alters the basic GAAP concept only slightly by deeming benefit for preliminary planning activities in a single, continuous project which is ultimately completed. The Secretary's interpretation of the terms in the provision effected no change in policy, as noted earlier. Also, the Secretary's accounting treatment is relatively simple to understand and to comply with. Furthermore, changing architects and discarding whole sets of plans is hardly a routine occurrence or pervasive problem. The provider complains of the "substantial impact" of the interpretive rule in this particular case. Apart from the fact that the provider is viewing the impact from its particular perspective and not from that of the industry as a whole, where the impact would be infrequent at best, the substantial impact test for distinguishing between "substantive" and "interpretive" rules is of dubious reliability and has been rejected by a number of courts. *See Cabais v. Egger,* 690 F.2d 234, 237–238 (D.C.Cir.1982) ("Interpretive and substantive rules may both vitally affect private interests, thus, the substantial impact test has no utility in distinguishing between the two."). Furthermore, the impact on the provider is hardly severe. It fully expected to have to capitalize the Lockwood Greene fees in the first place before the cost overrun occurred; and because of the hospital's paramount concern with the budget problems, its behavior would likely have been the same regardless of the Medicare treatment of architectural fees.

In conclusion, the Court finds no violation of the APA. In any event, were there

any procedural infirmities under the APA, they would be akin to harmless error in light of the fact that the Secretary alternatively found actual discernible benefit, without the benefit of the presumption.

### 4. *Constitutional Claim.*

■ The provider alleged the existence of an improper retroactive reversal of policy constituting a denial of due process. The provider failed, however, to press the constitutional claim in its brief or at oral argument. It suffices to reject the constitutional challenge by noting that the Manual provision was not retroactive, and that the Secretary's interpretation did not change any existing policy, but merely applied general principles to specific facts which were distinguishable from prior adjudications.

### 5. *Substantial Evidence.*

■ In reviewing the agency's factual finding for substantial evidence, the Court may not reverse simply because it is possible to draw a different or inconsistent conclusion from the same evidence. *In-Home Health Care v. Harris,* 512 F.Supp. 84, 87 (N.D.Ill.1981) *citing Consolo v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). The Court need only determine whether there was "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *Consolo,* 383 U.S. at 620, 86 S.Ct. at 1026. Apart from the discernible benefit provided by the presumption, the Secretary's decision noted that "the original plans, although not directly used in the final drawings, were referred to by the subsequent consultants and may have influenced some of the decisions made concerning the subsequent plans." Although there is ample testimony in the record that the second architect did not directly use the original plans in creating his design and that there are notable differences between the two,[10] these facts

---

**10.** The Court does note a peculiar similarity mentioned in the record. It appears that in the

radiation therapy department an electric sky-

do not negate the benefit derived from Lockwood Greene's activities in the context of a continuous project facing an imminent deadline.

The record indicates that the second architect was anxious to look at the plans to see what the problems were, "what another architect would do given the same solution," and "why this gross overrun of estimated cost [occurred]." The hospital vice-president admitted that the plans were given to Freeman White because "[t]hey served as a basis of discussion in terms of our design concepts and ideas that we had that the staff had generated and discussed with Lockwood Green [sic] from the field trips that they had made."

It was established that Lockwood Greene worked closely with the psychiatry staff and the radiation staff in ascertaining design concepts appropriate to their respective types of work and reviewed flow patterns, cabinet work, room arrangements, and square footage requirements.

The inference of some remaining discernible benefit is supportable; the benefit need not be substantial. Although the provider argues that the Secretary relied on "but two or three sentences taken out of nearly 200 pages of the transcript of the hearing before the PRRB" and points to testimony by the second architect that he did not use the Lockwood Greene plans at all, that he received no benefit from the work Lockwood Greene had done, and that generally he approached the project as if the Lockwood Greene plans did not exist, the Court concludes that such testimony can be viewed in light of the understandable reluctance of a professional to admit to any short-cuts or borrowing of concepts. Furthermore, such testimony, albeit largely conclusory, can be said to detract only from the substantiality of the benefit, which is not an issue, rather than the weight of evidence supporting a finding of some discernible benefit, however small. If the plans were as worthless as the provider contends, one would wonder why they were kept at all.

The Court is of the opinion that the Secretary may reasonably have inferred that the benefit was actually significant. The Secretary's counsel argues in his brief that Lockwood Greene's work in the design phase enabled the hospital staff to be more conversant in design terminology, more clear about their environmental preferences and requirements, and consequently better equipped to impart this data to the subsequent architect. Noting that the provider's witness admitted that the department heads were educated by their contact with the previous architect, counsel asserted that this would have enabled Freeman White to spend less time in its interviews with the staff, which was significant when considered in light of the time restraints imposed on Freeman White by the impending expiration of the certificate of need within six months. The provider attacks this argument as a *post hoc* rationalization of the kind proscribed in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, that case cannot be fairly read to proscribe all use of a lawyer's analytical skills to describe the relationship of actual evidence in the record to the agency conclusion reached and to advance probative inferences and legal arguments fairly derivable from the record and the administrative decision. Although the Court does not accord the counsel's argument probative weight and the Secretary's articulation of her basis for finding actual discernible benefit is brief, the Court may, nevertheless, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *International Ladies' Garment Union v. Donovan,* 722 F.2d 795, 814 (D.C.Cir.1983). Counsel's argument merely highlights a reasonable inference that can be derived from the record and that is inherent in the indirect benefit found to exist by the Deputy Administrator.

light was substituted in lieu of a real skylight

called for in the Lockwood Greene plans.

### V. *Conclusion.*

The Court concludes that the Secretary's decision is reasonable, in accordance with law and supported by substantial evidence. Capitalization will result in the costs being reimbursed both at the time Medicare patients actually use the building and commensurate with the changing levels of Medicare utilization over the years. The Court defers to the Secretary's policy choice, cognizant of her responsibilities as the steward of a public trust.

Accordingly, it is ADJUDGED and ORDERED that the plaintiff's motion for summary judgment be and the same is hereby denied, and that the Secretary's motion for judgment on the pleadings be and the same is hereby granted.

IT IS SO ORDERED.